UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PETER RODRIGUEZ,                    :
                                    :
          Plaintiff                 :     No. 4:10-CV-02524
                                    :
     vs.                            :     (Judge Caldwell)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant                 :

MEMORANDUM AND ORDER

BACKGROUND

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Peter Rodriguez's claim for social security
disability insurance benefits and supplemental security income
benefits.  For the reasons set forth below we will remand the case
to the Commissioner for further proceedings.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Rodriguez meets the insured status requirements of
the Social Security Act through December 31, 2012. Tr. 14, 16 and
106.[1]

_____

1.  References to "Tr.__" are to pages of the administrative
                                            (continued...)

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Rodriguez was born in the United States on October 5, 1972. Tr. 25, 70, 72 and 356.  Rodriguez has a limited education.  Tr. 380.  He withdrew from school after completing the 7th grade and has not obtained a General Equivalency Diploma (GED). Id.

Rodriguez has past relevant[2] unskilled to semi-skilled, medium work[3] experience as a sales route driver and a printer

_____

1.  (...continued)
record filed by the Defendant as part of his Answer on February 22, 2011.

2.  Past relevant employment in the present case means work performed by Rodriguez during the 15 years prior to the date his claim for disability benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

3.  The terms sedentary, light, medium, heavy and very heavy work are defined in the Social Security regulations as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more
(continued...)

helper. Tr. 393. Rodriguez had employment and earnings from 1988

until the fall of 2008.  His earnings were as follows: $866.29 in

1988, $1065.82 in 1989, $247.00 in 1990, $8837.40 in 1991,

$7025.32 in 1992, $11,558.56 in 1993, $2590.25 in 1994, $21,722.07

in 1995, $26,104.09 in 1996, $27,762.66 in 1997, $19,483.84 in

1998, $26,912.64 in 1999, $22,717.23 in 2000, $8858.38 in 2001,

---

3.   (...continued)
        than 20 pounds at a time with frequent lifting or
        carrying of objects weighing up to 10 pounds.  Even
        though the weight lifted may be very little, a job is
        in this category when it requires a good deal of
        walking or standing, or when it involves sitting most
        of the time with some pushing and pulling of arm or leg
        controls.  To be considered capable of performing a
        full or wide range of light work, you must have the
        ability to do substantially all of these activities.
        If someone can do light work, we determine that he or
        she can also do sedentary work, unless there are
        additional limiting factors such as loss of fine
        dexterity or inability to sit for long periods of time.

        (c) *Medium work*.  Medium work involves lifting no more
        than 50 pounds at a time with frequent lifting or
        carrying of objects weighing up to 25 pounds.  If
        someone can do medium work, we determine that he or she
        can do sedentary and light work.

        (d) *Heavy work*.  Heavy work involves lifting no more
        than 100 pounds at a time with frequent lifting or
        carrying of objects weighing up to 50 pounds. If
        someone can do heavy work, we determine that he or she
        can also do medium, light, and sedentary work.

        (e) *Very heavy work*.  Very heavy work involves lifting
        objects weighing more than 100 pounds at a time with
        frequent lifting or carrying of objects weighing 50
        pounds or more.  If someone can do very heavy work, we
        determine that he or she can also do heavy, medium,
        light and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

$3599.20 in 2002, $15,223.42 in 2003, $15,523.08 in 2004, $23,184.16 in 2005, $29,553.71 in 2006, $35,497.65 in 2007, and $35,199.62 in 2008. Tr. 63. His total earnings were $343,532.73. Id.

Rodriguez contends that he became disable on October 2, 2008. Tr. 14, 70 and 110. Rodriguez claims that he is unable to work because of mental and physical impairments. Tr. 35. Rodriguez identified depression, anxiety, panic disorder with agoraphobia[4] and concentration problems as his mental health impairments and low back and left leg pain as his physical impairments. Tr. 74, 109 and 387-388. Rodriguez last worked on October 2, 2008. Tr. 16.

Rodriguez protectively filed[5] his applications for disability insurance benefits and supplemental security income

---

4. According to the National Institute of Health's website

> [p]anic disorder with agoraphobia is an anxiety disorder in which there are repeated attacks of intense fear and anxiety, and a fear of being in places where escape might be difficult, or where help might not be available.

> Agoraphobia usually involves fear of crowds, bridges, or of being outside alone.

Panic disorder with agoraphobia, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001921/ (Last accessed December 14, 2011).

5. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

benefits on January 12, 2009. Tr. 14, 70-72, 106 and 353-361.  The applications were initially denied by the Bureau of Disability Determination on June 15, 2009.[6]  Tr. 35-39 and 346-350.  On June 20, 2009, Rodriguez requested a hearing before an administrative law judge. Tr. 30-32.  On October 28, 2009, a hearing was held before an administrative law judge. Tr. 374-396.  On December 15, 2009, the administrative law judge issued a decision denying Rodriguez's applications. Tr. 14-22.  On January 4, 2010, Rodriguez filed a request for review with the Appeals Council and on October 14, 2010, the Appeals Council concluded that there was no basis upon which to grant Rodriguez's request for review. Tr. 4-7 and 10.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.  Rodriguez then filed a complaint in this court on December 11, 2010.  Supporting and opposing briefs were submitted and the appeal[7] became ripe for disposition on May 18, 2011, when Rodriguez filed his reply brief.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner.

---

6.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration.  Tr. 36 and 347.

7.  Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d

198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

     Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts
from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.
474, 488 (1971).  A single piece of evidence is not substantial
evidence if the Commissioner ignores countervailing evidence or
fails to resolve a conflict created by the evidence.  Mason, 994
F.2d at 1064.  The Commissioner must indicate which evidence was
accepted, which evidence was rejected, and the reasons for
rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642
F.2d at 706-707.  Therefore, a court reviewing the decision of the
Commissioner must scrutinize the record as a whole.  Smith v.
Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v.
Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is

---

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation
(continued...)

severe or a combination of impairments that is severe,[9] (3) has an
impairment or combination of impairments that meets or equals the
requirements of a listed impairment,[10] (4) has the residual

_____

8.   (...continued)
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

9.   The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two. Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

10.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience."  Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
(continued...)

functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities.  Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

## MEDICAL RECORDS

The administrative record in this case is 396 pages in length and we have thoroughly reviewed that record.  Before we address the administrative law judge's decision and the arguments of counsel, we will review some of the psychiatric records.

_____

(...continued)
sequential evaluation process.

11.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Rodriguez commenced receiving treatment from Ramana G. Surya, D.O., a psychiatrist, in March, 2008, which was several months prior to his alleged disability onset date. Tr. 233.   At that time Dr. Surya indicated that Rodriguez suffered from either major depressive disorder or bipolar disorder, and impulse control disorder, and gave Rodriguez a Global Assessment of Functioning (GAF) score of 60-65.[12] Id.   Dr. Surya treated Rodriguez with the drug Lexapro.[13]

---

12.  The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas,  such as work or school, family relations, judgment, thinking or mood. Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id

13.  Lexapro is used to treat anxiety and major depressive disorder. Lexapro, Drugs.com, http://www.drugs.com/lexapro.html (Last accessed December 14, 2011).

On November 18, 2008, Rodriguez was admitted by Dr.
Surya to the psychiatric unit of the York Hospital, York,
Pennsylvania. Tr. 218.  Rodriguez's GAF score at admission was 45.
Dr. Surya commenced treating Rodriguez with the drug Seroquel[14]
and a family session was conducted with Rodriguez's parents on or
about November 19, 2008. Id.  Rodriguez was also evaluated by Alok
Saharan, M.D., a psychiatrist, on or about November 19, 2008, who
concluded that Rodriguez mental status had quickly improved and
authorized Rodriguez's discharge from the hospital on November 20,
2008.  Tr. 220-221.  At the time of discharge Rodriguez's GAF
score was 55 to 60. Tr. 218.  After discharge Rodriguez continued
to receive psychiatric treatment from Dr. Surya. Tr. 210-217.

On May 4, 2009, Dr. Surya completed a mental functional
capacity assessment of Rodriguez. Tr. 254-256.  Dr. Surya
concluded that Rodriguez had moderate restrictions in his ability
to understand and remember detailed instructions, carry out
detailed instructions, make judgments on simple work-related
decisions and respond appropriately to changes in a routine work
setting.[15] Id.  Dr. Surya further found that Rodriguez had marked

14.  "Seroquel (quetiapine) is an antipsychotic medicine. . . .
used together with antidepressant medications to treat major
depressive disorder in adults." Seroquel, Drugs.com, http://
www.drugs.com/seroquel.html (Last accessed December 14, 2011).

15.  "Moderate" was defined as "[t]here is moderate limitation in
                                                   (continued...)

limitations in his ability to respond appropriately to work
pressures in a usual work setting.[16] Id.

On May 19, 2009, Salvatore Cullari, Ph.D., a non-
treating, non-examining state agency psychologist, completed a
mental functional capacity assessment of Rodriguez. Tr. 257-273.
Dr. Cullari concluded that Rodriguez suffered from depression and
anxiety but that Rodriguez was "able to meet the basis mental
demands of competitive work on a sustained basis despite the
limitations resulting from his impairment." Tr. 259.

After Dr. Cullari evaluated Rodriguez, Rodriguez
continued to receive treatment from Dr. Surya. Tr. 322, 324, 326,
330,331 and 335.  On July 10, 2009, in addition to concluding that
Rodriguez suffered from major depressive disorder and possible
bipolar disorder, Dr Surya stated that Rodriguez suffered form
panic disorder with agoraphobia. Tr. 331.  In September, 2009, Dr.
Surya indicated that Rodriguez's condition had deteriorated
because of anxiety and multiple stressors.  Tr. 291.  On September
18, 2009, Dr. Surya completed a second mental functional capacity
assessment. Tr. 289-292.

---

15.  (...continued)
the area, but the individual can generally function well." Tr.
254.

16.  "Marked" was defined as "[t]here is serious limitation in
this area. The ability to function is severely limited but not
precluded." Tr. 254.

Dr. Surya found that Rodriguez had **marked limitations**[17] in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, carry out detailed instructions, sustain and ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted, make simple work-related decisions, perform at a consistent pace with a standard number and length of rest periods, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Id.

Dr. Surya found that Rodriguez had **extreme limitations**[18] in his ability to maintain attention and concentration for extended periods, perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances,

_____

17. "Marked" was defined as "[t]here is serious limitation in this area.  The individual cannot generally perform satisfactorily in this area." Tr. 289.

18. "Extreme" was defined as "[t]here is major limitation in this area. There is no useful ability to function in this area." Tr. 289.

14

and complete a normal workweek without interruptions from psychologically based symptoms. Id.

Dr. Surya further indicated that in her professional opinion Rodriguez would have 4 plus absences from work per month. Tr. 290. Dr. Surya further stated that she had treated Rodriguez since March, 2008, and that he had the limitations since October, 2008. Tr. 292.

In addition to treating with Dr. Surya, at the end of April, 2009, Rodriguez commenced receiving therapy from Larry Glenn, Ph.D., a licensed professional counselor. Tr. 337-338. Dr. Glenn had appointments with Rodriguez on April 28, May 19, June 16 and 29, July 6, August 5, 20 and 26, and September 2 and September 10, 2009. Tr. 323, 325, 327-329, 332-334 and 336. Dr. Glenn's diagnosis consistently was that Rodriguez suffered from major depressive disorder, recurrent, moderate to severe, without psychotic features (DSM Code 296.33, .3, .32) and panic disorder with agoraphobia (DSM Code 300.21). Id.

On September 21, 2009, Dr. Glenn completed a mental functional capacity assessment of Rodriguez. Tr. 341-343. Dr. Glenn found that Rodriguez had **marked limitations** in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, carry out detailed

instructions, interact appropriately with the general public and respond appropriately to changes in the work setting. Id.

Dr. Glenn found that Rodriguez had **extreme limitations** in his ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work related decisions, complete a normal workday without interruptions from psychologically based symptoms, perform at a consistent pace with a standard number and length of rest periods, ask simple questions and request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. Id.

Dr. Glenn further indicated that in his professional opinion Rodriguez would have 4 plus absences from work per month. Tr. 342.

16

A vocational expert testified at the administrative hearing held on October 28, 2009, that limitations such as found by Dr. Surya and Dr. Glenn would preclude Rodriguez from engaging in "any occupation in the economy." Tr. 395.

## Discussion

The administrative law judge went through each step of the sequential evaluation process and (1) found that Rodriguez had not engaged in substantial gainful activity since October 2, 2008, the alleged disability onset; (2) found that Rodriguez had the severe impairments[19] of degenerative disc disease of the lumbar spine, chronic pain syndrome, bipolar disorder, panic disorder, impulse control disorder and depression; (3) found that Rodriguez did not have a medically determinable cardiac impairment; (4) found that Rodriguez's impairments did not meet or equal a listed impairment; (5) found that Rodriguez lacked credibility;[20] (6)

---

19. An impairment is "severe" if it significantly limits an individuals ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

20. In judging the credibility of Rodriguez, the administrative law judge mentions that Rodriguez was terminated from his
(continued...)

rejected the opinions of Dr. Surya and Dr. Glenn and (7) concluded

that Rodriguez could not perform his past relevant work but that

he could perform a limited range of sedentary work. Tr. 116-21

Specifically, the administrative law judge stated that Rodriguez

could engage in full-time sedentary work as defined in the

regulations

---

20. (...continued)
employment in October,2008, for stealing a carton of cigarettes,
that Rodriguez admitted performing a "karate kick" when playing
with his son, and that Waddell's tests indicated that Rodriguez
was overstating his symptoms. Tr. 19-20. Although the
administrative law judge found that Rodriguez had a severe
impulse control disorder, the administrative law judge did not
consider whether Rodriguez's theft of cigarettes was related to
that impairment.  Also, the so-called "karate kick" was performed
apparently in either October, November or December, 2008, on one
occasion and would only have relevance to Rodriguez's physical
abilities. Also, the more limiting assessments of Dr. Surya and
Dr. Glenn regarding Rodriguez's mental functioning were not
issued until well-after that event. As for the so-called
"positive Waddell" signs no physician or other medical
professional indicated that this was evidence that Rodriguez
exaggerated his psychiatric or even his physical symptoms.  The
Waddell's tests were developed by Dr. Gordon Waddell as an
indicator of non-organic pain or pain caused by a psychological
component. The original tests involved 5 areas: tenderness,
stimulation, distraction, regional disturbance and overreaction.
It was assume that if you tested positive in 3 out of 5 areas
there was a non-organic component of your pain.  Historically
many have used a positive test as a sign of malingering.
However, the developer of the test, Dr. Waddell, criticized such
use in 1998. Main, Chris J.; Waddell, Gordon, Behavioral
Responses to Examination: A Reappraisal of the Interpretation of
"Nonorganic Signs", Spine. 23(21):2367-2371, November 1, 1998.
The administrative law judge stated that the positive Waddell's
signs "clearly establish that the claimant repeatedly overstates
his symptoms." Tr. 20.  As stated, no physician so indicated. The
administrative law judge by so concluding engaged in
inappropriate medical analysis.

> except the claimant requires alternating positions at
> will, and should avoid crawling. The claimant is capable
> of occasional overhead reaching, bending, climbing,
> balancing, stooping, kneeling and crouching and should
> avoid working near extreme exposure to vibration.  The
> claimant retains the mental capacity for simple,
> repetitive and routine two-step work instructions and
> should avoid high-paced production and piece work.

Tr. 17-18.  At the administrative hearing, the administrative law

judge asked the vocational expert to consider an individual with

the above residual functional capacity and Rodriguez's age,

education and work background.

In response to the administrative law judge's questions,

the vocational expert identified occupations as a semi-conductor

bonder[21] with 380 positions available in the region and 51,000 in

-----

21.  The vocational expert specified the Dictionary of
Occupational Titles (DOT) number for each position. The semi-
conductor bonder position's DOT number is 726.685-066 and is
described as follows: "Tends automatic bonding machine that bonds
gold or aluminum wire to integrated circuit dies to connect
circuitry to package leads: Reviews schematic diagram or work
order to determine bonding specifications. Turns dials to set
bonding machine temperature controls and to regulate wire feeding
mechanism. Mounts spool of wire onto holder and inserts wire end
through guides, using tweezers. Positions semiconductor package
into magazine of automatic feed mechanism, and observes package,
using microscope or equipment display screen, to ensure
connections to be bonded are aligned with bonding wire. Adjusts
alignment as necessary. Activates machine that automatically
bonds wire to specified connections on semiconductor package
leads. Removes packages from bonding machine and places packages
in work tray. May test tensile strength of bonded connections,
using testing equipment. May locate connections and bond wire to
connect circuitry of hybrid circuits, using precision-bonding
machine." Dictionary of Occupational Titles (4th Ed., Rev.
(continued...)

the national economy, a carding machine operator[22] with 250
available in the region and 40,500 in the national economy, and a
stuffer machine tender[23] with 180 in the region and 29,000 in the
national economy. Tr. 394.  Based on that testimony, the
administrative law judge found that Rodriguez was not disabled
because he could perform those three jobs, and that there were a
significant number of such jobs in the regional and national
economies. Tr. 22. In so finding, the administrative law judge

_____

21.  (...continued)
1991), United States Department of Labor,http://www.oalj.
dol.gov/PUBLIC/DOT/REFERENCES/DOT07C.HTM (Last accessed December
14, 2011).

22.  The carding machine operator position's DOT number is
681.685-030 and is described as follows:"Tends machine that winds
rope onto reel to form coil: Selects reel according to size of
rope and mounts reel on spindle, using wrench. Trims loose
strands from end of rope with knife and binds end with tape to
prevent unraveling. Ties end of rope to reel and starts machine.
Guides rope onto reel to ensure even winding. Stops machine and
ties coil with cord to prevent unwinding. Lowers coil onto dolly,
using chain hoist. Slides winding reel out of coil. May weigh
coils. May splice rope ends." Dictionary of Occupational Titles
(4th Ed., Rev. 1991), United States Department of Labor,
http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOT06E.HTM (Last
accessed December 14, 2011).

23.  The stuffer machine tender position's DOT number is 731.685-
014 and is described as follows: "Tends machine that blows filler
into stuffed-toy shells: Inserts precut supporting wire into
shell. Places shell opening over stuffing machine nozzle.
Depresses pedal to blow cotton or chopped foam rubber filler into
shell to impart shape to toy. Places stuffed toy in tote box.
Records production. May stuff toys by hand." Dictionary of
Occupational Titles (4th Ed., Rev. 1991), United States
Department ofLabor,http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/
DOT09A.HTM (Last accessed November 25, 2011).

purportedly relied on the opinion of Dr. Cullari, the non-treating and non-examining state agency psychologist. Tr. 20 and 257-260.

Rodriguez argues, inter alia, that the administrative law judge did not properly consider the opinions of Dr. Surya and Dr. Glenn and the credibility of Rodriguez. We find substantial merit in Rodriguez's arguments.[24]

The administrative law judge rejected the opinions of Dr. Surya and Dr. Glenn, both health providers who treated and had contact with Rodriguez.  These treating health providers assessed Rodriguez with functional mental limitations which precluded Rodriguez from engaging in full-time sedentary employment.

The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a non-treating, non-examining physician's

---

24.  The administrative law judge also failed to consider a statement from Rodriguez's mother. Tr. 98-105. It is legal error for an administrative law judge to fail to consider third-party statements or testimony regarding the functional abilities of a claimant.  Burnett v. Comm'r of SSA, 220 F.3d 112, 122 (3d Cir. 2000); Bunch v. Astrue, Civil Action No. 10-1921, slip op. *15 (M.D.Pa. filed Nov.21, 2011)(Nealon, J.); Oldenburgh v. Astrue, 2009 U.S. Dist. LEXIS 24867 * 26 (M.D. Pa. March 26, 2009)(Muir, J.). The Social Security regulations and rulings recognize the relevance of statements from family members and others who know a claimant.  See 20 C.F.R. §§ 416.912, 416.913 and 416.929; SSR 96-7p and 96-8p.  Such statements can shed light on a claimant's impairments,

opinion, the administrative law judge may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Id.  In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id.  An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id.  An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case the administrative law judge relied on the opinion of a non-treating, non-examining physician and his own lay analysis of the medical records to reject the opinions of a treating physician and a treating psychologist.  The vocational expert in this case testified that an individual with the

22

limitations assessed by these two health providers is considered
unemployable.   The administrative law judge rejected those
opinions and relied on the opinion of Dr. Cullari who only
reviewed the medical records as of May 19, 2009.  After that date
Rodriguez received treatment from Dr. Surya and  Dr. Glenn.   The
administrative law judge did not give an adequate reason for
rejecting the opinions of Dr. Surya and Dr. Glenn.  In fact in
rejecting the opinion of Dr. Glenn the administrative law judge
made a misstatement of fact.  The administrative law judge stated
that there were no treatment records from Dr. Glenn in the record.
Tr. 20.

          Also, the administrative law judge in evaluating
Rodriguez's credibility did not consider his lengthy work history.
As noted earlier in this order, Rodriguez had fairly consistent
employment from 1988 until October, 2008, a 20-year work history.
"When a claimant has worked for a long period of time, [his]
testimony about [his] work capabilities should be accorded
substantial credibility."   Rieder v. Apfel, 115 F.Supp.2d 496,
505 (M.D.Pa. 2000)(Munley, J.)(citing Dobrowolsky v. Califano, 606
F.2d 403, 409 (3d Cir. 1979)). The administrative law judge did
not give an adequate reason for discrediting Rodriguez's
testimony.

One final error that must be addressed is the administrative law judge's failure at step two of the sequential evaluation process to consider Rodriguez's agoraphobia and its impact on his ability to work with the general public, co-workers and supervisors.

The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c).  If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step 2 will not render a decision defective if some other medical condition was found severe at step two.  However, all of the medically determinable impairments both severe and non-severe must be considered at step 4 when setting the residual functional capacity.  The failure of the administrative law judge to find the agoraphobia as a medically determinable impairments, or to give an adequate explanation for discounting that condition, makes his decision at steps four and five of the sequential evaluation process defective.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.


 /s/ William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: December 19, 2011

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PETER RODRIGUEZ,                    :
                                    :
          Plaintiff                 :     No. 4:10-CV-02524
                                    :
     vs.                            :     (Judge Caldwell)
                                    :
MICHAEL J. ASTRUE,                  :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant                 :

<u>ORDER</u>

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

1.  The Clerk of Court shall enter judgment in favor of Peter Rodriguez and against Michael J. Astrue, Commissioner of Social Security, as set forth in the following paragraph.

2.  The decision of the Commissioner of Social Security denying Peter Rodriguez disability insurance benefits and supplemental security income benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Conduct a new administrative hearing and appropriately evaluate the medical evidence, the credibility of Peter Rodriguez  and the third-party statement of his mother in accordance with the background of this order.

26

3.   The Clerk of Court shall close this case.


 /s/ William W. Caldwell
WILLIAM W. CALDWELL
United States District Judge

Dated: December 19, 2011